UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DARYL KENNETH HENDERSON,
JR.,

Petitioner,

v.                                           CAUSE NO. 3:19-CV-974-RLM-MGG

WARDEN,

Respondent.

<u>OPINION AND ORDER</u>

Daryl Kenneth Henderson, Jr., a prisoner without a lawyer, filed a habeas corpus petition under 28 U.S.C. § 2254 to challenge his conviction for murder under Case No. 45G04-1208-MR-11. Following a jury trial, the Lake Superior Court sentenced Mr. Henderson on December 19, 2013 to fifty-four years of incarceration.

I.

In deciding a habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence presented at trial:

> On August 2, 2012, Henderson spent his afternoon drinking alcohol at his home in Gary, Indiana. At around 4:00 p.m., Henderson decided to drive to Rico's Pizza to get pizza for his family. At the time, Henderson's driver's license had been suspended. Henderson also carried a small handgun on his person despite the fact that his permit to carry a handgun had since expired. While driving to Rico's Pizza, Henderson was drinking from a can of beer. When he arrived at Rico's Pizza,

Henderson entered the restaurant holding his can of beer and placed his order. While waiting for his order, he bumped into Lawrence McIntosh (McIntosh), with whom he had no prior acquaintance. They engaged in small talk when Henderson stated that he wanted to buy alcohol, and McIntosh informed Henderson that there was a liquor store next door. Shortly thereafter, both men exited Rico's Pizza and entered Party Liquors. As they walked in, the cashier at Party Liquors told Henderson that he could not serve him if he had an open can of beer. Henderson turned around, walked out, placed his empty can of beer on the pavement, and walked back in. While Henderson was outside tossing his can of beer, McIntosh told the cashier that he wished Henderson would leave him alone. Henderson reentered Party Liquors, but since the cashier refused to sell him alcohol, he requested McIntosh to purchase alcohol on his behalf. The Party Liquors' surveillance video showed McIntosh paying for what looked like a six-pack of beer and leaving Henderson inside the liquor store. It further showed McIntosh walking to his car, dropping off his six-pack of beer, and going back into Rico's Pizza. Also, it showed Henderson leaving Party Liquors and returning to Rico's Pizza to pick up his pizza.

After Henderson picked up his pizza, he saw McIntosh on his way out. Henderson approached McIntosh, and both men talked briefly. A short while later, Henderson returned to Rico's Pizza to get a drink. When Henderson saw McIntosh seated inside the restaurant, he approached McIntosh and started circling him while making threatening hand gestures. That provoked McIntosh and prompted him to stand up to face Henderson. At that point, Henderson told McIntosh, "You want to act like you don't know me? . . . I got something for your ass when you come outside." McIntosh responded that he was tired of Henderson's "shit" and he told him to leave him alone and get his own beers. McIntosh then punched Henderson and a scuffle ensued. The fight did not last long because both men were ordered to go outside. Prior to the altercation, McIntosh had removed his t-shirt, but upon exiting Rico's Pizza, he began to put it back on. As soon as both men were outside, Henderson retrieved his handgun from his pocket, aimed it at McIntosh, and fired one shot at close range. Henderson fired two more shots at McIntosh as he was running away from him. Firing the shots, Henderson told McIntosh, "I told you I was gonna do this." McIntosh was hit twice: in his jaw and chest, with the chest wound causing his death. Meanwhile, Henderson ran toward his vehicle, fired two more random shots, and reloaded his gun.

A police officer who was on patrol in the nearby area heard the gunshots and drove toward the direction of the shots. When he arrived at Rico's

Pizza, he saw people pointing toward Henderson's vehicle and he immediately activated his emergency lights. Upon seeing the officer, Henderson fired one more shot in the officer's direction and fled from the scene. A high speed chase through the city ensued. Henderson's vehicle eventually came to a stop when it hit a stop sign. Henderson attempted to flee on foot and hid behind some bushes but was quickly apprehended by the officers. Although he resisted arrest, the officers were able to subdue him. Upon searching Henderson's vehicle, the officers found a small handgun on the floorboard. Because Henderson complained of injuries, he was taken to the hospital, for treatment. Henderson became unruly at that hospital and he had to be restrained. The following day, Gary police detectives interviewed Henderson after advising him of his Miranda rights. Henderson narrated four different versions of the events leading to the shooting.

ECF 7-6 at 2-4; Henderson v. State, 21 N.E.3d 898 (Ind. App. 2014).

Mr. Henderson argues in his petition that his trial counsel erred by not investigating the victim and eyewitnesses Juanita Hernandez and Vanessa Thomas, by not interviewing Mr. Henderson, and by inadequately presenting evidence to support a conviction on the lesser-included offenses of reckless murder and voluntary manslaughter.[1] Mr. Henderson further argues that he is entitled to habeas relief because the trial court erred by not instructing the jury on voluntary manslaughter.

## II.

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); Lewis v. Sternes, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid

---

[1] Mr. Henderson also argues that his trial counsel inadequately presented evidence to support the affirmative defense of self-defense. The court construes this claim as overarching the claims that trial counsel erred by not investigating the victim and eyewitnesses Juanita Hernandez and Vanessa Thomas and by not interviewing Mr. Henderson, so the court won't consider it separately.

procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. Boyko v. Parke, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." Anderson v. Brevik, 471 F.3d 811, 814–815 (7th Cir. 2006) (citing Boyko, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." Lewis v. Sternes, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." Id. "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." Id.

On direct review, Mr. Henderson presented his claim that the trial court erred by declining to instruct the jury on voluntary manslaughter to the Court of Appeals of Indiana and the Indiana Supreme Court.[2] ECF 7-3; ECF 7-7. At the post-conviction stage, Mr. Henderson presented the claims that trial counsel didn't adequately investigate the victim and the eyewitnesses and that trial counsel didn't interview

---

[2] The Warden argues that Mr. Henderson presented this claim to the State courts as purely a State law claim and did not "alert the state courts to the federal underpinnings of his claim." See Perruquet v. Briley, 390 F.3d 505, 519 (7th Cir. 2004). After reviewing Mr. Henderson's briefs on direct appeal, the court doesn't perceive that Mr. Henderson presented this claim as a constitutional violation to the State courts. Nevertheless, as discussed in greater detail below, the court acknowledges that this claim could be formulated as a constitutional claim and will assume that this claim is properly exhausted for purposes of this order to reach the merits of that formulation.

him to the Court of Appeals of Indiana and the Indiana Supreme Court. ECF 7-11; ECF 7-16. He didn't present his claim that trial counsel didn't adequately present evidence to support a conviction on the lesser-included offenses of reckless homicide and voluntary manslaughter at any level of the state courts, so this claim is procedurally defaulted.

Mr. Henderson asserts that the court should excuse procedural default because he proceeded without an attorney during post-conviction proceedings. A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure. Wainwright v. Sykes, 433 U.S. 72, 90 (1977); Wrinkles v. Buss, 537 F.3d 804, 812 (7th Cir. 2008). "Cause for a procedural default exists where something external to the petitioner, something that cannot fairly be attributed to him impeded his efforts to comply with the State's procedural rule." Maples v. Thomas, 565 U.S. 266, 280 (2012). As a general rule, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause." Id. The exception is that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." Martinez v. Ryan, 566 U.S. 1, 9 (2012); Brown v. Brown, 847 F.3d 502 (7th Cir. 2017). "[A] prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." Id. at 14. As detailed below, the court finds that the claim that trial counsel didn't adequately present evidence to support a conviction on the lesser-

included offenses of reckless homicide and voluntary manslaughter is not substantial

and declines to excuse procedural default.

III.

"Federal habeas review . . . exists as a guard against extreme malfunctions in

the state criminal justice systems, not a substitute for ordinary error correction

through appeal." <u>Woods v. Donald</u>, 135 S.Ct. 1372, 1376 (2015).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

<u>Woods v. Donald</u>, 135 S. Ct. at 1376. Criminal defendants are entitled to a fair trial

but not a perfect one. <u>Rose v. Clark</u>, 478 U.S. 570, 579 (1986). To warrant relief, a

state court's decision must be more than incorrect or erroneous; it must be objectively

unreasonable. <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011).

## IV.

### A.

Mr. Henderson argues that he is entitled to habeas relief because he received ineffective assistance of trial counsel. He says his attorney didn't adequately investigate the victim's criminal history, gang involvement, drug use, or reputation. He says that trial counsel should have deposed eyewitnesses Juanita Hernandez and Venessa Thomas to demonstrate their inconsistent testimony and bias against him. He also says that trial counsel didn't interview him or properly present evidence to support the lesser-included offenses of reckless homicide and voluntary manslaughter.

One claiming ineffective assistance of counsel must show that counsel's performance was deficient and that the deficient performance prejudiced him. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 688. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. The test for prejudice is whether there was a reasonable

probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under Strickland, "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied Strickland." McNary v. Lemke, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." Id.

The prosecution filed pretrial motions in limine with respect to the victim's tattoo, which read "Gangsta," and the victim's criminal history as inadmissible evidence of the victim's character, and Mr. Henderson's attorney didn't object. Direct Appeal App. 68-69; Trial Tr. 70. The prosecution also moved to exclude evidence of the presence of alcohol and fentanyl in the victim's blood as inadmissible evidence of the victim's character and because there were no toxicology expert witness to explain the laboratory results. Direct Appeal App. 65-67; Trial Tr. 70-79. Trial counsel objected on the basis that the victim's level of intoxication could have affected his conduct in a manner that could support the claim of self-defense, and the prosecution responded that the forensic expert believed that the fentanyl was likely used for the victim's medical treatment. Id. The trial court granted the motion with respect to the fentanyl and the blood alcohol levels but denied it with respect to the victim's consumption of alcohol that day. Id.

At trial, the prosecution introduced video recordings from security cameras from inside the pizza place and the liquor store and from the top of the liquor store facing the liquor store. State Ex. 2-4. Though they didn't include audio, these recordings encompassed substantially all of Mr. Henderson's actions from his arrival in the strip mall's parking lot until he fled from the parking lot in his vehicle.

Juanita Hernandez, a pizza place employee, supplemented the video recordings by testifying that the victim returned to the pizza place from the liquor store, and, before Mr. Henderson's return, he said, "God, I wish this dude would leave me alone." Trial Tr. 152. Before the fight inside the pizza place, Mr. Henderson said to the victim, "You want to act like you don't know me?," and "I got something for your ass when you come outside." *Id.* at 153. On cross-examination, Mr. Henderson's counsel asked Ms. Hernandez whether she disliked Mr. Henderson, which she denied. Trial Tr. 185-207. He also highlighted inconsistencies between her testimony on direct examination and her police interview, including whether she saw Mr. Henderson reload the firearm, her degree of familiarity with the victim, and who initiated the physical altercation. Id.

Debbie Munoz, a liquor store employee, testified that she asked the victim whether he knew Mr. Henderson based on the irritated look on his face, and he replied that he did not. *Id.*at 213, 231. Vanessa Thomas, a pizza place customer, testified that she heard Mr. Henderson say, "I told you I was gonna do this," as he fired at the victim running away. *Id.* at 236-37.

Mr. Henderson also testified at trial. Id. at 598-644. He testified that he had five alcoholic drinks that day and had an open can of beer as he entered the pizza place. Id. He accompanied the victim, whom he had just met that day, to the liquor store and asked the victim to buy him another can of beer. Id. The victim agreed but later refused, telling Mr. Henderson to "get [his] own shit." Id. When Mr. Henderson returned to the pizza place to buy a soft drink, he noticed that the victim seemed upset. Id. When Mr. Henderson asked what was wrong, the victim started swinging at him. Id. During the fight, Mr. Henderson felt "something hard . . . press against him," which he suspected was a firearm. Id. Other people in the pizza place told the victim and Mr. Henderson to leave the building, and the victim told Mr. Henderson, "Bring your ass outside. I got something for you." Id. When he left the building, he expected to see the victim walking away, but the victim was facing him and looked as though he were reaching for a firearm. Mr. Henderson shot at the victim solely in an effort to scare him away. Id. As the victim ran off, Mr. Henderson pursued him and fired another shot in the victim's general direction but did not aim it at the victim, continuing his effort to scare the victim away. Id.

According to Mr. Henderson, people suffered violent deaths every day in Gary, Indiana, where the pizza place incident occurred. Id. Mr. Henderson had been shot four years before the pizza place incident, and two of his family members had been murdered. Id.  On cross-examination, Mr. Henderson testified that he didn't see the victim with a firearm or any other weapon. Id. at 719.

At the jury instruction conference, trial counsel tendered an instruction on voluntary manslaughter. Id. at 751-59. The prosecution argued that the evidence did not support such an instruction because Mr. Henderson didn't testify that he was angry, enraged, resentful, jealous, or terrified or that he reacted without thinking. Id. Instead, he testified that he made a conscious decision to protect himself. Id. The trial court agreed with the prosecution and didn't give the jury the option of convicting Mr. Henderson of voluntary manslaughter. Id.

At closing, trial counsel argued that Juanita Hernandez wasn't credible because her testimony and the video recordings were inconsistent. Id. at 793-830. Contrary to her testimony, the video recordings didn't show the victim and Mr. Henderson engaged in a verbal altercation at the liquor store; Mr. Henderson didn't circle the victim before the physical altercation; she didn't see Mr. Henderson reload the firearm as she reported to the police; and she couldn't be certain that Mr. Henderson had aimed the firearm at her coworker. Id.

Trial counsel also argued that the victim's initiation of the physical altercation and Mr. Henderson's life experience were sufficient for Mr. Henderson to develop a reasonable fear that the victim intended to inflict serious bodily harm or death. Id. He argued that Mr. Henderson's actions were reckless at worst because Mr. Henderson's intent in shooting the firearm was not to kill but to scare away the victim. Id.

Mr. Henderson testified at the evidentiary post-conviction relief hearing consistent with his trial testimony except that he testified that he saw that the victim

pull out a black firearm. ECF 7-17 at 64-84. He testified that trial counsel told him not to mention the victim's firearm because it was never recovered. Id. He also testified that he saw that the victim had tattoos suggesting gang membership and that he later found out that the victim was intoxicated at the pizza place. Id. He testified that Juanita Hernandez used drugs and described his clothing on the day of the shooting incorrectly. Id.

Trial counsel also testified at the evidentiary hearing. Id. at 7-63. He testified that the video recordings and the number of eyewitnesses limited his options for a trial strategy. Id. His strategy involved arguing for self-defense primarily and offering the lesser offense of reckless homicide as an alternative. Id. He also tendered a voluntary manslaughter instruction that the trial court didn't accept. Id. He understood that the victim's history wouldn't have relevant to self-defense unless Mr. Henderson was aware of it at the time of the shooting. Id. He didn't see the victim's tattoos as relevant because the pizza place incident didn't involve gangs. Id. He didn't try to introduce the victim's arrest records for domestic battery. Id.

The Court of Appeals of Indiana rejected the claim that trial counsel should have introduced evidence of the victim's tattoos and criminal history. ECF 7-14 at 7-8. The appellate court reasoned that these issues were only relevant to the self-defense claim if Mr. Henderson knew about them at the time of the shooting. Id. The only evidence supporting that Mr. Henderson knew about the tattoos was his testimony at the post-conviction hearing, and the lower court had the discretion to find that testimony not credible. Id. The appellate court also rejected the claim that

trial should have deposed eyewitnesses, concluding that Mr. Henderson hadn't shown prejudice because he identified no additional material information that might have been discovered during these depositions.[3] Id. at 8-9.

After reviewing the record, this court can't find that the state courts made an unreasonable determination on these ineffective assistance of trial counsel claims. Evidence of the victim's tattoos and criminal history would relate to the victim's character. Under Indiana law, "evidence of the victim's character may be admitted for either of two distinct purposes: to show that the victim had a violent character giving the defendant reason to fear him or to show that the victim was the initial aggressor." Holder v. State, 571 N.E.2d 1250, 1254 (Ind. 1991). "When offering specific bad acts evidence to prove the victim's violent character frightened her, the defendant must also provide a foundation showing that she knew about the specific bad acts in question before she killed the defendant." Id. There is no dispute that the victim initiated physical contact with Mr. Henderson at the pizza place. Nor is there evidence to suggest that Mr. Henderson was aware of the victim's criminal history at the time of the incident. With respect to the victim's tattoos, Mr. Henderson testified that he was aware of them at the post-conviction hearing, but the State courts found this testimony to be not credible, and the court must defer to this finding because Mr.

---

[3] The Court of Appeals of Indiana didn't specifically address the claim that trial counsel did not interview Mr. Henderson. Upon review of Mr. Henderson's appellate brief, it seems likely that the appellate court considered this claim and the claim that trial counsel should have investigated the victim as a single claim. In his appellate brief, Mr. Henderson presents these claims as two separate claims but asserts that trial counsel would have learned only of Mr. Henderson's awareness of the tattoos and gang violence if he had interviewed Mr. Henderson. ECF 7-11 at 12-18.

Henderson hasn't rebutted it with clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

The Indiana courts didn't err on the claim that trial counsel should have deposed the eyewitnesses. The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984). This means that, to prevail on this claim, Mr. Henderson needs to show that the depositions would have produced testimony that had a reasonable chance to affect the jury verdict or his sentence. The record contains no evidence that the eyewitnesses would have testified differently at a deposition than they did at trial, so he can't prevail on this claim.

As already discussed, Mr. Henderson's claim that trial counsel didn't properly present evidence to support the lesser-included offenses of reckless homicide and voluntary manslaughter is procedurally defaulted. Because Mr. Henderson asserts that this omission resulted from ineffective assistance of counsel as the post-conviction stage, the court will consider whether this claim is substantial as required by Martinez v. Ryan, 566 U.S. 1, 9 (2012). The record indicates that Mr. Henderson testified at trial that he shot at the victim with the intent of scaring the victim away rather than to inflict bodily harm or to kill him and that trial counsel argued that the jury consider this testimony to find Mr. Henderson guilty of reckless homicide at closing. The record further indicates that trial counsel tendered a voluntary manslaughter instruction but that the trial court refused it. Consequently, this record

reflects that trial counsel made a reasonable effort to persuade the jury to convict Mr. Henderson of the lesser-included offenses, and Mr. Henderson offers no explanation as to what more he believes trial counsel should have done or how trial counsel's performance prejudiced him. This claim is not substantial and procedural default bars relief on this claim.

### B.

Mr. Henderson argues that he is entitled to habeas relief because the trial court erred by not instructing the jury on voluntary manslaughter. The Warden responds that this argument isn't a valid basis for habeas relief because the right to an instruction on a lesser-included offense in non-capital cases isn't clearly established federal law. Indiana law characterizes voluntary manslaughter as both an affirmative defense and a lesser-included offense to murder. Clark v. State, 834 N.E.2d 153, 156-58 (Ind. App. 2005). To the Warden's point, the United States Supreme Court has never recognized the right to a jury instruction on lesser-included offenses or to affirmative defenses in non-death penalty cases. See Gilmore v. Taylor, 508 U.S. 333, 343 (1993) ("None of [the Supreme Court's cases on the right to present a complete defense] involved restrictions imposed on a defendant ability to present an affirmative defense."); Beck v. Alabama, 447 U.S. 625, 638 (1980) n.14 ("We need not and do not decide whether the Due Process Clause would require the giving of [lesser-included offense] instructions in a noncapital case."); see also McMullan v.

Booker, 761 F.3d 662, 667 (6th Cir. 2014); Calloway v. Montgomery, 512 F.3d 940, 944 (7th Cir. 2008).

That said, the United States Supreme Court has treated voluntary manslaughter differently given its historical relationship with intentional murder and has held that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." Mullaney v. Wilbur, 421 U.S. 684, 704 (1975). For claims involving jury instructions on federal habeas review, a State petitioner must show that the jury instruction error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Under this standard, the petitioner must establish that the error "resulted in actual prejudice." Id.

Under Indiana law, "once a defendant presents evidence of sudden heat, to obtain a conviction for murder rather than voluntary manslaughter, the State bears the burden of disproving its existence beyond a reasonable doubt." Massey v. State, 955 N.E.2d 247, 255 (Ind. App. 2011). "Sudden heat is characterized as anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection." Roberson v. State, 982 N.E.2d 452, 456 (Ind. App. 2013). "'Terror' is defined as 'Alarm; fright; dread; the state of mind induced by the apprehension of hurt from some hostile or threatening event or manifestation; fear caused by the appearance of danger. Terror is also defined as 'intense, overpowering

16

fear.'" Clark v. State, 834 N.E.2d 153, 159 (Ind. App. 2005). "If . . . the record contains any appreciable evidence of sudden heat, an instruction on voluntary manslaughter is justified." Roberson v. State, 982 N.E.2d at 456.

At trial, Mr. Henderson testified as follows regarding how he felt immediately before the shooting:

> **Trial Counsel:** How did you feel that day as a result of what you had seen?
>
> **Mr. Henderson:** I felt scared. I felt threatened. I was in fear.
>
> **Trial Counsel:** Okay.
>
> **Mr. Henderson:** I felt threatened. I was in fear of my life.
>
> **Trial Counsel:** And you were in fear of your life more so on that day for what reason? More specifically on the day of August 2, why were you in fear for your life?
>
> **Mr. Henderson:** Because of threats that was made. [The victim] has said, "Bring your ass outside, I've got something for you," that put me in fear. Him attacking me physically, that put me in fear. Me going outside and seeing him, I took it that the guy was coming at me when I walked out the door. I didn't know what type of force he was about to use. I took it that he might have had a weapon because of what he had said when he walked out the door. So it put me in the position to be like protective, defensive.

Trial Tr. 643-44.

On direct appeal, the Court of Appeals of Indiana addressed the claim as follows:

> The manner of instructing a jury lies largely within the sound discretion of the trial court, and we review only for an abuse of that discretion. An abuse of the trial court's discretion occurs when the instructions as a whole mislead the jury as to the law in the case. A defendant is only entitled to a reversal if he affirmatively demonstrates that the instructional error prejudiced his substantial rights.

17

* * *

At trial, Henderson tendered a written instruction regarding voluntary manslaughter and reckless homicide as a lesser included offense of murder. The trial court instructed the jury on murder and reckless homicide but refused to instruct it on voluntary manslaughter after finding there was no serious evidentiary dispute as to whether or not Henderson acted under sudden heat. Henderson, however, claims that there was a serious evidentiary dispute as to whether there was sudden heat. Specifically, Henderson argues that he acted under sudden heat because he was in a state of fear after [the victim] punched him. We reject Henderson's argument and also find his reliance on Clark v. State, 834 N.E.2d 153, 159 (Ind. App. 2005), to support his theory of fear, misplaced. In Clark, two brothers exchanged words with Clark and then attempted to take Clark's bag. During the altercation, Clark stabbed one of the brothers, walked to a nearby shelter, dropped his knife, and stated that he had just stabbed someone who tried to rob him. At trial, Clark testified that the victim kept coming towards him even though he repeatedly told the victim to stop, and that he was fearful that the victim was going to pull out a gun and shoot him. On appeal, this court reversed Clark's conviction and remanded the case because there was serious evidentiary dispute that Clark killed the victim under sudden heat, therefore he was entitled to a voluntary manslaughter instruction.

Turning to the record, we find nothing comparable about Henderson's case. Henderson met [the victim] for the first time at Rico's Pizza on the day of the shooting. For the most part, [the victim] was pleasant to Henderson even though Henderson nagged and irritated him. When Henderson accosted [the victim] for ignoring him, [the victim] was forced to stand up and defend himself. Angered by Henderson's actions of circling him, [the victim] punched Henderson and the two men became embroiled in a scuffle. Witnesses at Rico's Pizza testified that, for the most part, Henderson kept charging at [the victim], and had to hold back Henderson from charging at [the victim]. When both men were ordered to leave, [the victim] was first to exit, followed by Henderson. While at the door, one of Rico's employees put his arm up to stop Henderson from walking out. Henderson, however, resisted and left Rico's Pizza. Once outside, the fist fight quickly degenerated into a gun battle. [The victim] was in the process of pulling his t-shirt back on when Henderson raised his gun and shot him. [The victim] started running away, but Henderson quickly followed [the victim] and fired two more shots at him. As he fired the shots, Henderson told [the victim], "I told you I was gonna do this." Henderson then walked to his vehicle and reloaded his gun. When the

18

officer arrived at the scene, Henderson fired one more shot in the officer's direction and fled the scene.

Unlike <u>Clark</u>, there was no appreciable evidence that Henderson acted under sudden heat because there is no evidence that Henderson was in fear of [the victim]. Though the shooting occurred immediately after [the victim] punched him, Henderson was not acting in fear, but had the sole intention of killing [the victim]. The record reveals that when he first confronted [the victim] at Rico's Pizza, Henderson told [the victim], "I got something for your ass when you come outside." In addition, Henderson admitted at trial that he retrieved his gun even before he exited Rico's Pizza. Instead of continuing with the fist fight, he fired several shots at [the victim] who was attempting retreat.

Based on the totality of the evidence, we find that nothing in this case illustrates any possibility of the existence of sudden heat. As we noted in the foregoing, sudden heat is characterized as "terror sufficient to obscure the reason of an ordinary person." In this regard, we conclude that there was no serious evidentiary dispute regarding whether Henderson killed [the victim] while acting in sudden heat. Clearly, the impetus to kill did not just suddenly overwhelm Henderson, instead his actions were clearly contemplated and not driven by fear. Accordingly, the trial court did not abuse its discretion in declining to give Henderson's proposed instruction on voluntary manslaughter.

ECF 7-6.

This court can't find that the denial of a voluntary manslaughter instruction had substantial and injurious effect or influence in determining the jury's verdict. The state court analysis did not account for Mr. Henderson's testimony regarding his state of mind and the victim's statement that "he got something for [Henderson,]" but, as the prosecution argued, Mr. Henderson's testimony as a whole conveyed a conscious and measured determination that he needed to defend himself rather than a state of terror resulting in irrational behavior. Accordingly, the state court determination on whether appreciable evidence supported a voluntary manslaughter instruction was not unreasonable.

Further, this court can't find that actual prejudice resulted from the absence of a voluntary manslaughter instruction. Mr. Henderson's testimony provided the strongest support at trial for the instruction, but as already stated, that testimony only weakly (if at all) conveyed a state of irrationality induced by overpowering fear. No other evidence supported this instruction. To the contrary, a video recording showed Mr. Henderson pursuing the victim in the dining area as the store employees broke up the fight and tried to keep them separated. State Ex. 4. It showed Mr. Henderson pushing through an employee's arms to pursue the victim outside the building. Id. The video recordings showed Mr. Henderson shooting immediately after leaving the building as the victim was in the act of putting on his shirt. Id.; State Ex. 3. Eyewitness testimony indicated that, before the fight, Mr. Henderson said to the victim, "You want to act like you don't know me?," and "I got something for your ass when you come outside." Trial Tr. 153. Eyewitness testimony also indicated that Mr. Henderson said, "I told you I was gonna do this," as he fired at the victim running away. Id. at 236-37.

Mr. Henderson's testimony presented substantial credibility issues given the number of times he contradicted the video recordings and other similarly reliable evidence. For instance, he denied following the victim to the liquor store as indicated on the video recording but offered "that he was trying to be led to the liquor store." Id. at 656. He testified that he thanked the victim for getting him beer on direct examination but denied testifying to that effect on cross-examination. Id. at 608, 662. Despite video evidence to the contrary, he denied actively participating in the fight

and pursuing the victim within the dining room area. Id. at 677-78. He similarly denied that the victim was putting on shirt as he exited the building but testified that the victim "appeared to be coming at [him]." Id. at 681-82, 719-20, 739. He falsely testified that the video recording of the police interview showed that the detectives whispered his Miranda rights to him. Id. at 716. He contested the location where his vehicle stopped after the police pursuit when a clear set of tire tracks permitted only one reasonable conclusion on the issue. Id. at 696-700; State Ex. 27-31. Finally, the conviction for murder rather than a conviction for reckless homicide or an acquittal reflects that the jury did not credit Mr. Henderson's material testimony about why he believed that the victim posed a threat or about whether he intended to kill the victim by shooting at him.

The record contains minimal support for a voluntary manslaughter instruction, demonstrates that Mr. Henderson had substantial credibility issues, and indicates that the jury largely disregarded his testimony on material facts involving his mental state. The court can't find that the absence of a voluntary manslaughter instruction resulted in actual prejudice. The claim that the trial court denied Mr. Henderson an instruction on voluntary manslaughter is not a basis for habeas relief.

## V.

Under Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a

constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Mr. Henderson to proceed further.

The court DENIES the habeas corpus petition (ECF 1); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on August 18, 2021

s/ Robert L. Miller, Jr.
JUDGE
UNITED STATES DISTRICT COURT